**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------ x
COLONY GRILL DEVELOPMENT, LLC    :
and FAIRFIELD COLONY, LLC,       :
                                 :
     Plaintiffs/Counterclaim     :
          Defendants,            :
                                 :
v.                               :
                                 :
COLONY GRILL, INC. and           :
COLONY GRILL OF STAMFORD, LLC,   :
                                 :   Civil No. 3:20-cv-213 (AWT)
     Defendants/Counterclaim     :
          Plaintiffs,            :
                                 :
v.                               :
                                 :
PAUL CONIGLIO, KENNETH M.        :
MARTIN, CODY L. LEE, and         :
CHRISTOPHER DRURY,               :
                                 :
     Counterclaim Defendants.    :
------------------------------ x
```

**SUPPLEMENTAL RULING ON MOTIONS FOR PRELIMINARY INJUNCTION**

### I.    BACKGROUND

Counterclaim Plaintiffs Colony Grill, Inc. ("CGI") and Colony Grill of Stamford, LLC ("CGS") sought preliminary injunctions against Counterclaim Defendants Colony Grill Development, LLC ("CGD") and Fairfield Colony, LLC ("FCLLC").[1] The court denied the motions for a preliminary injunction, and

---

[1] The court notes that the individual Counterclaim Defendants were added when the Counterclaim Plaintiffs filed an amended answer and counterclaim on May 28, 2021, shortly after the second motion for a preliminary injunction was filed.

CGI appealed. It had sought a preliminary injunction based on its claims that the Counterclaim Defendants "breached a licensing agreement and therefore were improperly utilizing CGI's trademark, trade secrets, and licensed "know-how" and were in violation of a covenant not to compete with CGI." Second Circuit Summ. Order, Case No. 21-2136 (ECF No. 390) at 3. CGI appealed only the denial of the preliminary injunction as to its counterclaim for infringement of its federally-registered trademark.

The Second Circuit affirmed in part and vacated in part this court's order and remanded the case for further consideration consistent with the Summary Order. As summarized by CGI, upon remand this court must:

(1) evaluate the request for a preliminary injunction to restrain use of the trademark under the prohibitory injunction standard;

(2) "decide in the first instance what effect, if any, the licensing agreements . . . [have] on CGI's likelihood of success on the merits of its trademark infringement claim and whether CGD and FLLC are barred by licensee estoppel from challenging the validity and ownership of the trademark";

(3) if CGI has a likelihood of success, determine whether the presumption of irreparable harm in view of the legal considerations that

(a) "a trademark holder's loss of control of the trademark may cause harm even if an alleged infringer is running a successful business with use of the mark,"

-2-

    (b)  "a trademark holder may compete in the marketplace as a licensor rather than an operator," and

    (c)  "whether monetary damages would be an adequate remedy"

(4)  "consider the balance of the harms and the public interest associated with CGI's request for a preliminary injunction based on its trademark infringement claim, apart from the assumption that granting such relief would require the closure of restaurants."

CGI Supp. Br. (ECF No. 407) at 1-2.

"A claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed under the familiar two-prong test described in Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993)." Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003). "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. Gruner, 991 F.2d at 1074." Id.

## II.  LEGAL STANDARD

"To obtain a preliminary injunction, plaintiff must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a

-3-

balance of hardships tipping decidedly in plaintiff's favor."
Louis Vuitton Malletier v. Dooney & Burke, Inc., 454 F.3d 108,
113-14 (2d Cir. 2016).

### III. PARTICIPATION BY CGS

The Counterclaim Defendants maintain that CGS "has
forfeited the right to challenge this Court's August 2021
ruling" due to its failure to appeal the court's denial of the
motion for a preliminary injunction. Counterclaim Defs.' Supp.
Br. (ECF No. 403) at 1-2. They argue that "CGS's acquiescence in
the Court's order denying the motions for preliminary injunction
is important here because CGI is barred under its agreement with
CGS from licensing the Colony Grill name to anyone anywhere in
the world or from using the name itself," id. at 14, and that
"only CGI's arguable interests may be considered" and "any
arguable interest of CGS should therefore not now be
considered," id.

"The law of the case doctrine provides that 'a legal
decision made at one stage of litigation, unchallenged in a
subsequent appeal when the opportunity to do so existed, becomes
the law of the case for future stages of the same litigation,
and the parties are deemed to have waived the right to challenge
that decision at a later time.'" Casey v. United States, 161
F.Supp.2d 86, 91 (D. Conn. 2001) (quoting North River Ins. Co.
v. Philadelphia Reinsurance Corp., 63 F.3d 160, 164 (2d Cir.

1995)). "The doctrine does not limit or prohibit the court's power to revisit those issues; it 'merely expresses the practice of courts generally to refuse to reopen what has been decided.'" Id. (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988)).

Here, because the claims asserted by the Counterclaim Plaintiffs are intertwined to such an extent that the analysis as to CGI is dependent on the facts and analysis as to CGS, the court exercises its discretion to permit CGS to participate in these proceedings on remand.

### IV.   IMPACT OF LICENSING AGREEMENTS

In its oral ruling, although the court decided that "there are sufficiently serious questions going to the merits to make them a fair ground for litigation," the court did not conclude that the Counterclaim Plaintiffs had established a likelihood of success on the merits or find it necessary to "enumerate those issues" because other factors weighed in favor of denying the motion for a preliminary injunction. Oral Ruling Tr. (ECF No. 368) at 13. In the Summary Order, the Second Circuit directed the court "to decide in the first instance what effect, if any, the licensing agreements . . . [have] on CGI's likelihood of success on the merits of its trademark infringement claim and whether CGD and FCLLC are barred by licensee estoppel from challenging the validity and ownership of the trademark." Second

Circuit Summ. Order at 9-10. The court concludes that licensee estoppel does not bar CGD and FCLLC from challenging the validity and ownership of the trademark. However, because the court separately concludes that the Counterclaim Plaintiffs have not established irreparable harm, the court does not address the parties' arguments as to likelihood of success with respect to the validity of the mark or likelihood of consumer confusion.[2]

**A.    The Agreements**

1.    2010 Master License Agreement

On March 12, 2010, CGI and CGS entered into a license agreement ("2010 Master License Agreement"). See Joint Ex. 1. Section 1(e) of the 2010 Master License Agreement provided in full that:

> "Licensed Marks and Logo" shall mean those common law trademarks and service marks listed in Appendix B hereto, including the name "Colony Grill", **and such other trademarks, service marks, copyrights, and patents hereinafter developed by the Licensor.**

2010 Master License Agreement at 2 (emphasis added). With respect to trademarks, Appendix B stated:

---

[2] Nevertheless, for the reasons discussed below as to irreparable harm, the court finds that CGI has not demonstrated consumer confusion or established a likelihood of confusion as to sponsorship, at least pending trial.

| Mark | Goods |
|---|---|
| **Colony Grill**<br><br>**Unregistered text plus [design mark]** | Pizza and beverages |
|  |  |

Id., App'x B.

    2.   FCLLC Sub-License Agreement

    On May 28, 2010, CGS and FCLLC entered into a sub-license agreement ("FCLLC Sub-License Agreement"). See Joint Ex. 2. The agreement recites in the preamble that CGI granted CGS "the right to use, license, sublicense or otherwise transfer the use of the Licensed Marks and Logo (as defined herein) . . . on the terms and conditions set forth in a License Agreement dated March 12, 2010." FCLLC Sub-License Agreement at 1 (emphasis added). For some reason, however, Section 1(f) of the FCLLC Sub-License Agreement differs from Section 1(e) of the 2010 Master License Agreement and provides in full that:

> "Licensed Marks and Logo" shall mean those common law trademarks and service marks listed in Appendix B hereto, including the name "Colony Grill".

Id. at 2. With respect to trademarks, Appendix B states:

| Mark | Goods |
|---|---|
| **Colony Grill**<br><br>**Unregistered text** | Pizza and beverages |
|  |  |

<u>Id.</u>, App'x B. In addition, Section 5(b) of the FCLLC Sub-License Agreement provides that "[t]he Licensee shall not challenge the validity or Licensor's ownership of the Licensed Marks and Logo and the Licensed Know-How." <u>Id.</u> at 5. At no point does the FCLLC Sub-License Agreement incorporate by reference any definitions from the 2010 Master License Agreement, including the broader definition of Licensed Marks and Logo found in the 2010 Master License Agreement.

    3.  <u>CGI-FCLLC Agreement</u>

On May 28, 2010, CGI and FCLLC also entered into an agreement ("CGI-FCLLC Agreement"). <u>See</u> Joint Ex. 3. The agreement recites in the preamble that CGI "has agreed to grant Colony Grill of Stamford, LLC . . . the right to use, license, sublicense or otherwise transfer the use of the Licensed Marks and Logo (<u>as defined herein</u>)." CGI-FCLLC Agreement at 1 (emphasis added). It also recites that CGS was "formed to license, sublicense or otherwise transfer the use of the Licensed Marks and Logo (<u>as defined herein</u>) . . . owned by the Master Licensor to Licensee" and that CGS "has agreed to grant

the Licensee [FCLLC] the right to use the Licensed Marks and Logo . . . on the terms and conditions set forth in a License Agreement dated May 27, 2010." Id. (emphasis added).[3]

The definition of "Licensed Marks and Logo" in Section 1(e) of the CGI-FCLLC Agreement is the same as that in Section 1(f) of the FCLLC Sub-License Agreement. See id. at 2. As in the FCLLC Sub-License Agreement, Section 4(b) of the CGI-FCLLC Agreement provides that "[t]he Licensee shall not challenge the validity or Master Licensor's and/or the Licensor's ownership of the Licensed Marks and Logo and the Licensed Know-How." Id. at 3-4.

    4.   Patent Office Service Mark Registration

On February 8, 2011, the U.S. Patent and Trademark Office issued a certificate of registration to CGI for the service mark "Colony Grill" for "bar and restaurant services" (the "Registered Trademark"). Joint Ex. 14. "The mark consists of standard characters without claim to any particular font, style, size, or color." Id.

    5.   2012 Master License Agreement

On June 20, 2012, CGI and CGS entered into a new master license agreement ("2012 Master License Agreement"). See Joint Ex. 5. As with the 2010 Master License Agreement, Section 1(e)

---

[3] This appears to be a reference to the FCLLC Sub-License Agreement dated as of May 28, 2010.

of the 2012 Master License Agreement provides in full that:

> "Licensed Marks and Logo" shall mean those common law trademarks and service marks listed in Appendix B hereto, including the name "Colony Grill", **and such other trademarks, service marks, copyrights, and patents hereinafter developed by the Licensor.**

2012 Master License Agreement at 2 (emphasis added). Likewise, with respect to trademarks, Appendix B states:

| Mark | Goods |
|---|---|
| **Colony Grill**<br><br>**Unregistered text plus [design mark]** | Pizza and beverages |
|  |  |

Id., App'x B.

    6.   CGD Sub-License Agreement

On June 20, 2012, CGS and CGD entered into a sub-license agreement ("CGD Sub-License Agreement"). See Joint Ex. 6. The agreement recites in the preamble that CGI granted CGS "the right to use, license, sublicense or otherwise transfer the use of the Licensed Marks and Logo (as defined herein) . . . on the terms and conditions set forth in a Master License Agreement dated June 20, 2012." CGD Sub-License Agreement at 1 (emphasis added). As with the FCLLC Sub-License Agreement, Section 1(g) of the CGD Sub-License Agreement differs from Section 1(e) of the 2012 Master License Agreement and provides in full that:

"Licensed Marks and Logo" shall mean those common law trademarks and service marks listed in Appendix B hereto, including the name "Colony Grill".

Id. at 2. With respect to trademarks, Appendix B states:

| Mark | Goods |
|---|---|
| **Colony Grill**<br><br>**Unregistered text** | Pizza and beverages |
|  |  |

Id., App'x B. Section 5(b) of the CGD Sub-License Agreement provides that "[t]he Licensee shall not challenge the validity or Licensor's ownership of the Licensed Marks and Logo and the Licensed Know-How." Id. at 5. At no point does the CGD Sub-License Agreement incorporate by reference any definitions from the 2010 Master License Agreement or the 2012 Master License Agreement, including the broader definition of Licensed Marks and Logo found in the 2010 Master License Agreement and the 2012 Master License Agreement.

7.   CGI-CGD Agreement

On June 20, 2012, CGI and CGD also entered into an agreement ("CGI-CGD Agreement"). See Joint Ex. 7. The agreement recites in the preamble that CGI "has agreed to grant Colony Grill of Stamford, LLC . . . the right to use, license, sublicense or otherwise transfer the use of the Licensed Marks and Logo." CGI-CGD Agreement at 1. It also recites that CGS was

"formed to license, sublicense or otherwise transfer the use of the Licensed Marks and Logo (<u>as defined herein</u>) . . . owned by the Master Licensor to Licensee," that CGD "was formed to be the exclusive, worldwide licensee in order to market, advertise and sell pizza and beverages . . . using the Licensed Marks and Logo (<u>as defined herein</u>)," and that CGS "has agreed to grant the Licensee [CGD] and any of its Affiliates an exclusive, worldwide, non-transferable license, with the right to sub-license, to use the Licensed Marks and Logo . . . <u>on the terms and conditions set forth in a License Agreement dated June 20, 2012</u>." <u>Id.</u> (emphasis added).

Again, the definition of "Licensed Marks and Logo" in Section 1(e) of the CGI-CGD Agreement is the same as in Section 1(g) of the CGD Sub-License Agreement. <u>See</u> <u>id.</u> at 2. Likewise, Section 4(b) of the CGI-CGD Agreement provides that "[t]he Licensee shall not challenge the validity or Master Licensor's and/or the Licensor's ownership of the Licensed Marks and Logo and the Licensed Know-How." <u>Id.</u> at 3.

**B.   Licensee Estoppel**

"The general rule of licensee estoppel provides that when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes." <u>Idaho Potato Comm'n v. M & M</u>

Produce Farm & Sales, 335 F.3d 130, 135 (2d Cir. 2003). "'A "no challenge" provision in a license agreement,' such as the one in the parties' License Agreement, 'makes the estoppel clear and explicit.'" HSW Enterprises, Inc. v. Woo Lae Oak, Inc., 2009 WL 4823920, at *2 (S.D.N.Y. Dec. 15, 2009). However, "[e]ven in the absence of any proviso in the contract not to contest the validity of the trademark or trade name," courts have held that a licensee, "in recognizing the [licensor] as the owner of the trademark or trade name under the terms of the agreement, would be estopped to claim otherwise." Heaton Distrib. Co. v. Union Tank Car Co., 387 F.2d 477, 482 (8th Cir. 1967). Thus, a licensee "is precluded from contending that the [marks] are invalid by virtue of his acceptance of a sublicense to use them." E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc., 90 F.Supp.2d 277, 292 (S.D.N.Y. 2000).

However, there are limits on the scope of this general rule. First, "[l]icensee estoppel precludes only licensees of a mark," or "an alter ego of the licensee," "from contesting it," not individuals who merely own or are otherwise affiliated with the licensee. Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc., 908 F.3d 313, 321 (8th Cir. 2018) (citation omitted). See also 3 McCarthy on Trademarks and Unfair Competition § 18.63 (5th ed.) ("The licensee estoppel rule precludes only licensees from a challenge: other parties, even

those closely affiliated with the licensee, are not
foreclosed."). Second, even where a licensing agreement purports
to cover all of a licensor's marks, "[t]he rule of licensee
estoppel . . . generally covers only the mark that the licensee
has agreed 'to use' since by agreeing to pay to use it 'the
licensee effectively recognizes [its] validity.'" Sturgis
Motorcycle Rally, Inc., 908 F.3d at 322 (quoting Idaho Potato
Comm'n, 335 F.3d at 135). See also id. ("It would be
antithetical in any event to the pro-competitive purposes of
trademark law . . . to allow a licensor to lay claim to marks
that its licensees have not used by inserting superfluous
language into its licensing agreements."). Where a licensing
agreement "unambiguously pertains only to the enumerated service
marks as defined in that document," it is clear that "the
doctrine of licensee estoppel does not equitably bar Defendant
from challenging Plaintiff's rights in marks that are not within
the scope of the license." World Trade Centers Ass'n, Inc. v.
Port Auth. of New York & New Jersey, 2018 WL 6628840, at *10
n.12 (S.D.N.Y. Dec. 18, 2018).

Based on the current record, it appears that licensee
estoppel does not apply to the individual Counterclaim
Defendants because they were neither licensees nor alter egos of
the licensees. See Sturgis Motorcycle Rally, Inc., 908 F.3d at
321. In Sturgis, plaintiff SMRI asserted that licensee estoppel

-14-

applied to defendant Rushmore Photo & Gifts, Inc. ("Rushmore"), as well as Rushmore's individual owners, who were also named as defendants. The court rejected the plaintiff's argument, stating that, "at most, the doctrine would apply to Rushmore, leaving the other defendants free to challenge SMRI's marks." Id. The court noted that "SMRI does not argue that any of Rushmore's co-defendants are its alter ego." Id. at 321-22. Here, the individual Counterclaim Defendants signed the FCLLC Sub-License Agreement only "[f]or purposes of Section 6, Section 14(b) and Section 14(l)" of that agreement, and they signed the CGD Sub-License Agreement only "[f]or purposes of Section 6, 11 and 13(b)" of that agreement. Nothing in those sections of the agreements treats the individual Counterclaim Defendants as licensees or as the alter egos of the respective licensees, i.e., FCLLC and CGD. See FCLLC Sub-License Agreement at 1 (defining "FCLLC, LLC" as "the 'Licensee'"); CGD Sub-License Agreement at 1 (defining "Colony Grill Development, LLC" as "the 'Licensee'").

Based on the current record, it is not apparent how licensee estoppel applies to CGD or FCLLC with respect to the Registered Trademark. First, the Counterclaim Plaintiffs contend that "the common law trademark COLONY GRILL is the very same trademark that is the subject of the COLONY GRILL registration" and that "any challenge by the Counterclaim-Defendants to the

COLONY GRILL registration is a challenge to the COLONY GRILL trademark." CGI Resp. Supp. Br. (ECF No. 410) at 4. The court agrees in part.

Generally, "it is confusing and inaccurate to refer to two separate marks--a registered mark and a common-law mark. Rather, there is a single mark, as to which different rights attach from the common law and from federal registration." Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc., 909 F.3d 1110, 1115 (Fed. Cir. 2018). Accordingly, licensee estoppel usually prevents a licensee from challenging "the mark that the licensee has agreed 'to use' since by agreeing to pay to use it 'the licensee effectively recognizes [its] validity.'" Sturgis, 908 F.3d at 322 (quoting Idaho Potato Comm'n, 335 F.3d at 135).

Here however, as noted by the Counterclaim Defendants, there is a discrepancy between the Counterclaim Plaintiffs' description of the unregistered mark in connection with the goods pizza and beverages and their description of the Registered Trademark in connection with what appears to be the broader category of bar and restaurant services. This distinction is very clear in the licensing agreements. Each of the agreements with CGD and FCLLC (i.e., the FCLLC Sub-License Agreement, the CGI-FCLLC Agreement, the CGD Sub-License Agreement, and the CGI-CGD Agreement) states that "'Licensed Marks and Logo' shall mean those **common law** trademarks and

service marks listed in Appendix B hereto, including the name
'Colony Grill'." (emphasis added). In each of these agreements,
Appendix B lists, under "Licensed Marks and Logo," the mark
"Colony Grill," described as an "**[u]nregistered text**" for the
provision of the specific goods "[p]izza and beverages."
(emphasis added). None of these agreements refers explicitly or
implicitly to any other trademark, registered or unregistered,
and each provides that it constitutes the entire agreement
between the parties. In contrast, the agreements between CGI and
CGS (i.e., the 2010 Master License Agreement and the 2012 Master
License Agreement) have a broader definition of "Licensed Marks
and Logo" that includes "such other trademarks, service marks,
copyrights, and patents hereinafter developed by the Licensor."
(emphasis added). It is only under the 2010 Master License
Agreement between CGI and CGS--not between them and the
Counterclaim Defendants--that "Licensed Marks and Logo" can be
understood to include the 2011 Registered Trademark "Colony
Grill" for "bar and restaurant services."

Thus, although the unregistered mark and the Registered
Trademark may be one and the same, the Counterclaim Plaintiffs
expressly limited the license to "common law trademarks and
service marks," specifically the "[u]nregistered text" "Colony
Grill" in association with the goods "[p]izza and beverages,"
even after the 2011 registration of "Colony Grill" in

-17-

association with "bar and restaurant services." Moreover, it appears that the Counterclaim Plaintiffs structured the agreements with the Counterclaim Defendants this way even after they had done otherwise in the master license agreements between CGI and CGS. Each agreement with CGD and FCLLC "unambiguously pertains only to the enumerated service marks as defined in that document," i.e., use of "Colony Grill" as a common law mark for certain goods. World Trade Centers Ass'n, Inc, 2018 WL 6628840, at *10 n.12. In addition, it appears that the Counterclaim Plaintiffs chose to include a no-contest provision that applies only to the "Licensed Marks" as defined in the agreements with FCLLC and CGD. In light of the foregoing, the court cannot conclude that this distinction has no effect.

Second, the Counterclaim Plaintiffs contend that, "even if there were a question regarding the scope of the Counterclaim-Defendants' contractual promise, . . . . it was plainly implied that the license agreement authorized CGD and FCLLC to use the registered mark COLONY GRILL," and that the Counterclaim Defendants were "using [the] mark under an implied license." CGI Resp. Supp. Br. at 4-5. The Counterclaim Plaintiffs point to the fact that "CGI never sued the Counterclaim-Defendants for infringement during the licensed period" and that "the Counterclaim-Defendants consistently paid license fees for nearly a decade" as evidence that "there was an implied right to

use the registered COLONY GRILL mark." Id. at 5. However, in view of the clear and unambiguous language of the agreements discussed above, the court cannot conclude that there was an implied licensing agreement as to the Registered Trademark. The respective agreements between CGI and CGS and between FCLLC and CGD provide:

> Entire Agreement/Amendments. The terms and conditions herein constitute the entire agreement between the Parties and shall supersede all previous agreements, either oral or written, between the Parties hereto with respect to the subject matter hereof. . . . No amendment, modification or other agreement of understanding bearing on this Agreement shall be binding upon either Party hereto unless it shall be in writing and signed by the duly authorized officer or representative of each of the Parties and expressly refer to this Agreement.

FCLLC Sub-License Agreement § 14(i). See also CGI-FCLLC Agreement § 8(i) (same); CGD Sub-License Agreement § 13(i) (same); CGI-CGD Agreement § 8(i) (same).

"A license to use a trademark is a contract, and disputes over the language of a trademark license are governed by the rules of contract interpretation." Geneva Int'l Corp. v. Petrof, Spol, S.R.O., 608 F.Supp.2d 993, 998 (N.D. Ill. 2009). Where "an integrated contract's terms are clear and unambiguous," as they are here, "the court must give those words their ordinary and natural meaning, and evidence of a prior or contemporaneous agreement is not admissible to vary the terms." Id. Thus, based on the current record, it is not apparent how licensee estoppel

can be applied to CGD or FCLLC on the basis of an implied
licensing agreement with respect to the Registered Trademark.

## V.   IRREPARABLE HARM

However, assuming _arguendo_ that the Counterclaim Plaintiffs
have a likelihood of success on the merits, this gives rise to a
presumption that they would suffer irreparable harm in the
absence of an injunction. See 15 U.S.C. § 1116(a). "When the
statutory presumption is triggered, it is the accused infringer
who must produce argument and evidence either that continuing
likelihood of confusion would not create an appreciable injury
to sales, goodwill and reputation or that any such damage could
be adequately compensated for by a future award of money to the
trademark owner." 5 McCarthy on Trademarks and Unfair
Competition § 30:47.

In _Church of Scientology Int'l v. Elmira Mission of the
Church of Scientology_, the court stated:

> For many years we have consistently held that a
> preliminary injunction should usually issue when the use
> of a mark creates a likelihood of confusion in the
> consumers' minds as to the ownership or sponsorship of
> a product. Our cases clearly say that establishing a
> high probability of confusion as to sponsorship almost
> inevitably establishes irreparable harm.

794 F.2d 38, 41 (2d Cir. 1986). The court stated further that
"when in the licensing context unlawful use and consumer
confusion have been demonstrated, a finding of irreparable harm
is automatic." Id. at 42. Here, CGI has neither demonstrated

consumer confusion nor established a high probability of
confusion as to sponsorship pending trial. To the contrary, the
Counterclaim Defendants have shown there will be no confusion as
to sponsorship pending trial.

CGS simply asserts that "likelihood of confusion is not
disputed in this case . . . ." CGS Supp. Br. (ECF No. 402) at
11. But the Counterclaim Plaintiffs point to no evidence of a
potential for consumer confusion as to sponsorship pending
trial. On the other hand, the Counterclaim Defendants provided
evidence that they are the only ones operating Colony Grill
restaurants, so there is no risk of confusion in consumers'
minds at this time. Also, they have produced evidence that CGS
has no present plan or intention to license or open any Colony
Grill restaurant anywhere, much less in any area where the
Counterclaim Defendants are currently operating. As to CGI,
under its license agreement with CGS, it is prohibited from
licensing other restaurants. Moreover, the court agrees with the
Counterclaim Defendants that the Instagram post about the Tampa
restaurant attached by CGS to its brief, "supports Counterclaim
Defendants' position that the public does not view CGI or CGS as
a source for Colony Grill, and that the public considers the
Stamford and all the other Colony Grill restaurants to be
associated with a single source--Counterclaim Defendants. That
is to say that the public currently perceives the Colony Grill

trademark as accurately indicating that the source of the goods
and services coming from all the Colony Grill restaurants is the
same." Counterclaim Defs.' Resp. Supp. Br. (ECF No. 412) at 9.

"A trademark licensor has a particular interest in
controlling the use of its mark by its licensees in order to
preserve the mark's quality and its continued vitality." Church
of Scientology Int'l, 794 F.2d at 43. "'If a trademark owner
allows licensees to depart from its quality [or other]
standards, the public will be misled, and the trademark will
cease to have utility as an informational device.'" Id.
(alteration in original) (quoting Kentucky Fried Chicken Corp.
v. Diversified Packaging Corp., 549 F.2d 368, 380 (5th Cir.
1977)).

> "One of the most valuable and important protections
> afforded by the Lanham Act is the right to the quality
> of the goods manufactured and sold under the holder's
> trademark." In attaching its mark to its goods over time,
> a holder assures consumers that the goods conform to the
> mark holder's quality standards.

Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243-44 (2009)
(quoting Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d
392, 395 (2d Cir. 1986)). "[W]e have held that goods are not
genuine if they do not conform to the trademark holder's quality
control standards or if they differ materially from the product
authorized by the trademark for sale." Zino Davidoff, 571 F.3d
at 243 (internal quotation marks and citations omitted).

-22-

We ruled in Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3 (2d Cir. 1996), that a trademark holder is entitled to an injunction against one who would subvert its quality control measures upon a showing that (i) the asserted quality control procedures are established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark.

Id. at 244.

The Counterclaim Defendants and the Counterclaim Plaintiffs each point to evidence supporting their respective positions on the question of whether CGI and CGS have quality standards or quality control standards or procedures, and whether CGI and CGS abide by any such procedures. But however that issue is resolved, the Counterclaim Defendants have shown that there is no evidence that any product sold by them differs in any way from the products authorized by the trademark for sale or fails to conform to any such quality standards or procedures. Rather, the evidence is that not only do the products being sold conform to any such standards or procedures, but also that the Counterclaim Defendants actually set the standards and procedures.

As to injury to reputation, in "Power Test Petroleum Distributors v. Calcu Gas, 754 F.2d at 95, [the court] said that irreparable harm exists in a trademark case when the party seeking the preliminary injunction 'shows that it will lose control over the reputation of its trademark pending trial.'"

Church of Scientology Int'l, 794 F.2d at 43 (1986) (quoting Power Test Petroleum, 754 F.2d 91, 95 (1985)). Consequently, in Church of Scientology Int'l, the court found that denying a preliminary injunction would "put[] the Church's reputation beyond its own control. And, it is that loss of control which is the very thing that constitutes irreparable harm in the licensing context." Church of Scientology Int'l, 794 F.2d at 44. The court found that "the mere possibility that defendants could during the interval until trial depart from the teachings of the Church is sufficient to warrant the issuance of a preliminary injunction." Id.

The court cited to Grand Lodge, Etc. v. Eureka Lodge No. 5, Etc., 114 F.2d 46 (4th Cir. 1940), for the proposition that "to allow a former 'Elk' Lodge that had seceded from the general organization to continue using the name would 'subject plaintiff in the public mind to responsibility for the action of a group over which it has no further control.'" Church of Scientology Int'l, 794 F.2d at 44.

The court also took note of a case where it was appropriate not to issue a preliminary injunction, National Bd. Of Y.M.C.A. v. Flint Y.M.C.A., 764 F.2d 199 (6th Cir. 1985). "[I]t was precisely because the National YMCA organization had acquiesced in the use of its marks by unaffiliated or suspended local YMCA organizations that the court refused to issue a preliminary

injunction." <u>Church of Scientology Int'l</u>, 794 F.2d at 44.

Here, on April 2, 2012, CGI entered into the Management Agreement with a company under the control of the Counterclaim Defendants. In the Management Agreement, CGI "agree[d] to grant the Manager all management rights of" the Stamford restaurant. Joint Exh. 4 at 1. The Management Agreement states: "The parties acknowledge and agree that the services to be provided by the Manager will consist of services provided at the Restaurant itself . . . ." <u>Id.</u> at 4. It also states: "The Manager will set all policies and procedures of the Restaurant, which will be communicated to the Owner." <u>Id.</u> at 5. The Management Agreement provides that only two "actions or steps shall be subject to prior review and approval of the Owner: (i) Any change in the name of the Restaurant or any proposed new use of such name in any manner. (ii) Approval of the financial statement of the Restaurant." Joint Ex. 4 at 5. Thus, no matter what the outcome of the trial on the issues in this case, the Counterclaim Defendants, who since 2012 have exercised significant control over the reputation of the trademark at issue here, will continue to have such significant control. In addition, the Counterclaim Defendants have shown that they operate all of their Colony Grill restaurants and the Stamford restaurant under a common set of standards and procedures. Thus, the Counterclaim Defendants have shown that there is no risk of the Counterclaim

Plaintiffs suffering any injury to the reputation of their
trademark pending trial. Consequently, this case is more
analogous to National Bd. of Y.M.C.A. than to Church of
Scientology Int'l or Grand Lodge.

The Summary Order states that "a trademark holder may
compete in the marketplace as a licensor rather than an
operator." Second Circuit Summary Order, Case No. 21-2136 at 11
(citing Church of Scientology Int'l 794 F.2d at 45). The Summary
Order quotes the following language from Church of Scientology
Int'l: "Once a licensor authorizes a licensee to use the mark in
a particular area, he has demonstrated his desire to expand into
that area, and when his licensee loses that authorization, he
should not have to prove its intention to re-erect a new
presence in the area." 794 F.2d at 45. This language in the
Summary Order appears to be in response to the fact that "the
district court suggested that such a presumption would be
rebutted because CGD and FCLLC 'have only enhanced the value of
the brand' and 'there is no evidence of any plan on the part of
[CGI] to actually compete in the restaurant business in the near
future.' Special App'x 4-5." Second Circuit Summary Order, Case
No. 21-2136 at 10. The analysis in this ruling with respect to
irreparable harm, confusion as to sponsorship, quality standards
or quality control standards or procedures, and injury to
reputation is based on the premise that CGS (and CGI to the

-26-

extent it is permitted to do so) compete or would compete in the marketplace as licensors, rather than operators, of restaurants.

Finally, the court must consider whether monetary damages would be an adequate remedy. The court concludes that under the circumstances present here, monetary damages would be an adequate remedy. As discussed above, the Counterclaim Defendants have produced evidence showing that there is neither consumer confusion nor a high probability of confusion as to sponsorship; that there is no risk that pending trial there will be a departure by the Counterclaim Defendants from any quality standard or quality control standards or procedures by which the Counterclaim Plaintiffs abide; and that there is no risk of the Counterclaim Plaintiffs suffering any injury to the reputation of their trademark pending trial. The only remaining category of potential harm is monetary damages. As the court concluded at the end of the preliminary injunction hearing, the parties here engaged in arm's length negotiations that established a value for the use by the Counterclaim Defendants of the Colony Grill trademark. Had the Counterclaim Defendants continued to use the Colony Grill trademark with the authorization of the Counterclaim Plaintiffs, the Counterclaim Plaintiffs would have received revenue. They can be compensated for their loss of revenue with an award of monetary damages.

## VI.   BALANCE OF HARMS AND THE PUBLIC INTEREST

The Counterclaim Defendants identify a number of financial and nonfinancial harms they would suffer if the court issues a preliminary injunction. First, Paul Coniglio testified at the preliminary injunction hearing about the cost of rebranding existing locations. At that time, he estimated the cost to be approximately $250,000 to $275,000. He has now submitted a declaration (ECF No. 403-1) explaining the estimated out-of-pocket costs to rebrand all of the currently existing Colony Grill restaurants other than the Stamford restaurant. His declaration contains a detailed breakdown of the costs of ordering new signage; decorating the inside and outside of the restaurants; purchasing new uniforms; customer promotional materials and other branded materials for the restaurant; building and launching a new website and digital media; hiring a public relations firm to help with a new brand launch; and rebranding all corporate documents. His declaration also includes an estimate for lost profits and additional labor costs, including the cost of closing each restaurant for at least several days to complete rebranding. The estimate now is $640,000 to $860,000 in immediate out-of-pocket costs, plus lost profits and increased labor costs. The Counterclaim Plaintiffs assert that this summary of costs is merely an effort to elicit sympathy but do not give any substantive criticism of the

categories or the amounts. It is apparent that the cost of rebranding will be substantial and well in excess of $250,000.

The Counterclaim Defendants also argue, persuasively, that "rebranding would effectively impose a permanent injunction in this case[] because it makes neither business nor trademark sense for Counterclaim Defendants to bounce back and forth between brand names." Counterclaim Defs.' Supp. Br. at 38. The Counterclaim Defendants point out that they would lose substantial goodwill they have built in the brand through their advertising and marketing over the years and "would have to face the increased costs of running restaurants under two different brands." Counterclaim Defs.' Resp. Supp. Br. at 31. See also id. ("Much of the value in the unified brand would be lost, before the trial on the merits.").

The Counterclaim Plaintiffs contend that the balance of harms strongly favors the issuance of injunction because "CGI continues to suffer irreparable harm every single day from the loss of control over its mark." CGI Supp. Br. at 13. As discussed above, the evidence with respect to what is likely to occur prior to trial does not support that argument. The Counterclaim Plaintiffs also argue that the Counterclaim Defendants will suffer no harm from an injunction because earlier in this case they stated that they would rebrand the restaurants. However, as noted by the Counterclaim Plaintiffs,

when they made that statement, they did not suggest that they would not be harmed financially and otherwise by rebranding.

The court concludes that the balance of harms weighs decidedly against issuance of a preliminary injunction.

As to the public interest, the Counterclaim Plaintiffs maintain that "'the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion.'" Id. (quoting Church of Scientology Int'l, 794 F.2d at 44). However, here there is evidence that there will be no consumer confusion pending trial. Also, as argued by the Counterclaim Defendants, "a well-functioning trademark system requires trademarks to serve their primary purpose as an indicator of source and quality," Counterclaim Defs.' Resp. Supp. Br. at 33, and because issuing an injunction would require rebranding, there would be two names for a "single, uniform source," id. Thus, the court concludes that the public interest weighs slightly against the issuance of an injunction.

**VII. CONCLUSION**

For the reasons set forth above, the court leaves in place its order denying the Counterclaim Plaintiffs' motions for a preliminary injunction.

It is so ordered.

Dated this 29th day of March 2023, at Hartford,

Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
